Dalton Leon LOCKE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–749.

Court of Criminal Appeals of Oklahoma.

Sept. 17, 1976.

Robert E. Walker, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Doug Combs, Legal Intern, for appellee.

OPINION

BRETT, Judge.

The appellant, Dalton Leon Locke, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Logan County, case No. CRF–74–64, for the crime of Murder in the Second Degree. From a sentence of ten (10) years to life imprisonment in the State penitentiary, the defendant brings this timely appeal.

Dr. Tommy L. Hewett testified that in his capacity as Oklahoma County Medical Examiner, he had an occasion to examine the body of William R. Deadwiley, on October 27, 1974. He stated the death was caused by a gunshot wound of the head and that he removed the projectile fragments. Based on his previous experiences with bullet wounds, Hewett felt the weapon ranged from .22 to .32 caliber.

Mrs. William R. Deadwiley's testimony disclosed that the deceased was employed by the Oklahoma Publishing Company to deliver papers to Crescent, Langston and Coyle, and that he was to do so on October 26, 1974. The witness said that for the last nine or ten years her husband had left the house at about 4:00 a.m. Since the day in question, the wallet of the deceased has been missing.

Inman Stroud, Jr. testified that in the early morning hours of October 26, 1974, he was in Brown's Place in Langston, Oklahoma with his brother-in-law, Ulysses Cumby. The defendant was also present and obtained loans of $3.00 and $5.00 from the witness. An additional loan was denied whereupon the defendant left Brown's place, only to return in a few minutes with a brown bag, identified as State's Exhibit No. 4, containing three revolvers. The defendant offered to sell the weapons to Stroud for $40.00, but was refused. Stroud and his brother-in-law then left Brown's, accompanied by the defendant, and went to Cigar Jones, "where they serve drinks and gamble." After repeated attempts to sell the guns to the witness and Jones, the defendant finally accepted an offer from the witness' brother-in-law to sell two guns for $30.00. The defendant kept one .22 pistol "stuck in the front of his pants," and later turned it over to Julius Suttle while the defendant was playing pool. The witness and his brother-in-law were in Jones' place from 12:00 to 3:00 a. m.

Ulysses Cumby's testimony, as to the events of October 26, 1974, was substantially similar to his brother-in law's, Inman Stroud. Additionally, he said that he unleaded the two revolvers upon returning home and noticed that the .22 was loaded with longs and shorts. At 10:00 a.m., October 27, 1974, while standing around outside of Cigar Jones, the witness asked the defendant, in a kidding manner "why did you shoot that man." Cumby could not recall the defendant's response, but did not remember the defendant denying the accusation.

By stipulation Mrs. Stroud's testimony was admitted. She said she did not bother the two guns her husband brought home on October 26, 1974.

Walter "Cookie" Chambers testified that on October 26, 1974, he was in Cigar Jones' place until 6:30 a.m. He witnessed the presence of the defendant, saw him leave about 4:30 or 5:00 o'clock and return about 6:00 o'clock. Upon returning the defendant was eating a piece of bologna and stated that a person had been shot, two or three times outside.

E. G. "Cigar" Jones stated that on October 26, 1974, he refused to loan the defendant money, or buy his guns. He saw the defendant leave between 4:00 o'clock and 5:00 o'clock and heard the defendant say,

upon returning at about 5:30, that a person had been shot. The defendant was eating a piece of bologna. The witness felt that in order to obtain this bologna, the defendant would have to pass by the scene of the "accident." After learning of this accident the witness went to the scene and helped carry the deceased to the ambulance. He heard no one discuss the shooting. Theodosius Black's testimony elicited that he was in Cigar Jones' place on October 26, 1974, and that he observed the defendant there at about 3:00 o'clock.

Julius Suttle testified next. Suttle said he was present at Jones' place on October 26, 1974, and that he saw the defendant with three guns, one of which, a long barrel .22, the defendant asked Suttle to hold for him. This gun, identified as State's Exhibit No. 5, was returned to the defendant between 1:30 and 2:00 o'clock. At about 5:30, the witness was informed of an accident down the road and proceeded to the scene, with one J. C. Burris. The party in the car "was already gone." Suttle returned to the road and observed the defendant in the road eating a piece of bologna. Suttle also identified State's Exhibit No. 5, as the gun he found under a car parked in front of Cigar Jones some two or three weeks after the events of October 26, 1974.

J. C. Burris testified that he was traveling through Langston just before 6:00 a. m., on October 26, 1974, when he observed a car in the ditch. He proceeded to Cigar Jones' place, informed the occupants of the "accident" and returned to the scene with Suttle. As he was leaving, to call a highway patrol, a man "came up on the opposite side of the road," and inquired as to the occurrences. Burris was unable to identify this man.

Herman Gilmore's testimony displayed his presence one block from the scene of the "accident" at about 5:30 a.m. Gilmore noticed nothing unusual at that time.

Billy Kouts testified that he was traveling through Langston just before 6:00 a.m. on October 26, 1974, and stopped to assist at an accident. He saw the defendant walking in the highway and heard him mutter "that man was done dead. He done had his happy days fucking." Kouts helped carry the deceased to the ambulance, saw no injury on his face and heard no one discuss a shooting.

Testimony of the State's next two witnesses was entered upon stipulation. Betty Dreessen, on duty at Logan County Memorial Hospital as a registered nurse, received the body of William Deadwiley and treated it as a "code blue" i. e., DOA by heart attack. She was unaware of any gunshot wounds. The testimony of deputy George Stout disclosed that he retrieved State's Exhibit No. 5, from Cigar Jones' place and turned it over to Ed Loffi of the Oklahoma Bureau of Investigation.

James Smith's testimony elicited that he answered an emergency ambulance call in Langston and arrived about 6:35 a.m. Although the face of the deceased was covered with blood, Smith noticed no bullet wounds, and heard nothing regarding a shooting.

Testifying next for the State, Trooper Gary Adams stated that he was the investigating officer of the "accident." Adams treated the incident as auto accident, possibly caused by a heart attack. Until subsequently notified by the hospital of the bullet wounds Adams was not aware of the shooting. He later searched the area, but found no weapon.

Ed Loffi testified that in his capacity as agent for the Oklahoma Bureau of Investigation he investigated the death of William R. Deadwiley. He was told by the defendant that on the night in question, at about 5:00 or 5:30, the defendant left Cigar Jones and was approached by a black man in a 1969 or 1970 model car. This party wanted to buy back a gun from the defendant, but, as defendant did not have it, the party accepted the long barrel .22 that the defendant had on him. This man, named Joe according to the defendant, was never found. Loffi said the fingerprint tests of the car proved negative. The two guns

sold to Cumby and Stroud by the defendant were retrieved by Loffi, and he later received the gun found in front of Cigar Jones i. e., State's Exhibit No. 5.

Carl Cloud testified that as a firearms examiner for the Oklahoma Bureau of Investigation he inspected the bullets taken from the deceased. The bullets were too badly damaged to allow identification, but due to their weight Cloud said they could be .22 longs, but not .22 shorts. He said the fragments could be part of a bullet larger than a .22 caliber.

Robert E. Ringrose's testimony divulged that he discovered the bullet wounds of the deceased on the morning of October 26, 1974. He reported these gunshot wounds to the highway patrol.

At this juncture the State rested.

The defendant did not testify, nor did he present any evidence.

Over the defendant's objections the State was allowed to reopen its case and re-examine Ed Loffi. Loffi stated that when he received State's Exhibit No. 5, from his deputy it had five spent rounds in it, three shorts and two longs.

■■■ The defendant's first assignment of error allegedly exposes the trial court's erroneous limitation of the defendant's cross-examination of Julius Suttle. Said cross-examination consists of defense counsel's attempts to discover whether Suttle could positively identify State's Exhibit No. 5, as the same gun he returned to the defendant on October 26, 1974. Suttle continued to insist that it was the same weapon and counsel attempted to refute this by displaying Suttle's prior contradictory statements and by submitting that the other guns like the one in question were undoubtedly in existence. As the defendand correctly reiterates, we have often held that the right to cross-examination is a profoundly consequential right which, ultimately, serves the defendant as a shield and a sword. *Megown v. State*, Okl.Cr., 300 P.2d 673 (1956), *Williams v. State*, 92 Okl.Cr. 70, 220 P.2d 836 (1950). Deny the right of cross-examination and the defendant is without an effective means of exposing the defenses and failures that potentially lurk behind the testimony of adverse witnesses. While a liberal construction must be applied to this sword play, still, limits must be. observed so as to keep counsel from carving out elements of doubt and suspension that do not exist. The law will sheathe defendant's weapons before allowing him to force the witness into positions unwarranted by the evidence. These controlling reins have historically and correctly been placed in the hands of the trial court whose prospective of the demeanor at trial circumstances is vastly superior to that of an appeal court. The consequence of this faith in trial discretion is that only the most obvious and prejudicial abuses of it will uphold a reversal. *Kanatser v. Chrysler Corporation*, 10 Cir., 199 F.2d 610, cert. denied 344 U.S. 921, 73 S.Ct. 388, 97 L.Ed. 710 (1952); *Wickham v. Belveal*, Okl., 386 P.2d 315 (1963); *Mussil v. Bizal*, Okl., 384 P.2d 46 (1963). Viewing the present controversy through this lens we see that the trial court did not so abuse its discretion as to merit or agreement with the defendant's contentions.

■■ Secondly, defendant assigns as error the closing arguments of the prosecution which allegedly refer to the defendant's failure to testify. The defendant relates the distinction between the erroneous action of commenting on defendant's failure to take the stand, and allowable discussion of, and the reasonable inferences drawn from the State's uncontroverted evidence. *Story v. State*, Okl.Cr., 478 P.2d 929 (1970); *Woods v. State*, Okl.Cr., 440 P.2d 994 (1968); *Tilford v. State*, Okl.Cr., 437 P.2d 261 (1968). A fair reading of the District Attorney's closing argument places it safely within the latter category, hence forcing a rejection of the defendant's position.

■■ The defendant's third assignment of error purports that the State's case is so lacking in evidentiary support that it fails to reach the plateau of proof beyond a rea-

sonable doubt. This contention once again rejuvenates the issues that appear when the prosecution's case is made entirely of circumstantial evidence. Cases composed of circumstantial evidence alone do not deny defendant due process when the State's evidence clearly points towards defendant's guilt and excludes every reasonable hypothesis other than guilt. Especially applicable here is our holding in *Williams v. State*, Okl.Cr., 478 P.2d 359 (1970):

> "[H]owever, when the state presents its hypothesis, based on circumstantial evidence for the jury to consider, and no other hypothesis is offered for the jury to consider of said defendant's plea of 'not guilty', the jury has little alternative but to consider that evidence presented to them; and when the state's hypothesis is logical and reasonably supported by the evidence, the jury's verdict will not be disturbed."

Application of this principle exhibits the necessity of denying defendant's claims.

For the above and foregoing reasons the judgment and sentence appealed from is *AFFIRMED*.

BUSSEY and BLISS, JJ., concur.